**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
BRIAN GERARD KOCH,

                  Plaintiff,

          -against-

COMMISIONER OF SOCIAL SECURITY,

                  Defendant.
---------------------------------------------------------X

**MEMORANDUM OF**
**DECISION & ORDER**
14-CV-4755(ADS)

<u>**APPEARANCES:**</u>

**Osterhout Disability Law, LLC**
*Attorneys for the Plaintiff*
521 Cedar Way Suite 200
Oakmont, PA 15139
      By: Karl E. Osterhout, Esq., Of Counsel

**The United States Attorneys' Office, E.D.N.Y.**
*Attorneys for the Defendant*
271 Cadman Plaza East
Brooklyn, NY 11201
      By: Candace Scott Appleton, Assistant U.S. Attorney

**SPATT, District Judge**.

        The Plaintiff Brian Gerard Koch (the "Plaintiff") brings this action pursuant to 42 U.S.C.

§ 405(g) for review of the final decision of the Carolyn W. Colvin, the Acting Commissioner of

the Social Security Administration (the "Commissioner"), finding that the Plaintiff is not entitled

to disability insurance benefits under Title II of the Social Security Act (the "Act").  Presently

before the Court is a motion by the Commissioner for a judgment on the pleadings pursuant to

Federal Rule Civil Procedure ("Fed. R. Civ. P.") 12(c) affirming the decision by the

Commissioner.  In addition, the Plaintiff filed a cross-motion styled as a "motion for summary

judgment" seeking a judgment that the Commissioner's decision was "arbitrary, contrary to law,

and unsupported by substantial evidence," and remanding the case for further administrative

proceedings.

1

For the reasons set forth below, the Court grants the Commissioner's motion, denies the

Plaintiff's motion, and affirms the Commissioner's decision denying the Plaintiff disability

benefits.

## I. BACKGROUND

### A. The Plaintiff's Background

The Plaintiff is currently fifty-eight years old and lives in North Merrick, New York.

(SSA Rec. at 5.)  The highest grade he completed was the Eighth Grade.  (Id. at 45)  From 1994

to 1996, he worked as a "purchaser" at Champion Windows, which entailed inputting orders on

the computer, picking up orders, and occasionally driving the company truck. (Id. at 11–13, 152,

176.)  From 1998 to December 2008, he worked as a truck driver for Alpha Window Systems

("Alpha").  (Id. at 152.)  As part of his duties, he would load materials onto a truck, which

regularly exceeded forty to fifty pounds.  (Id. at 10–11.)  In December 2008, Alpha went out of

business, and he lost his job.  (Id. at 12.)

### B. The August 20, 2012 Hearing

On October 24, 2011, the Plaintiff filed for disability insurance benefits dating back to

December 30, 2008.  (Id. at 148.)  He claimed disability due to diverticulosis, anxiety,

depression, and insomnia.  (Id. 148–151.)  On January 30, 2012, the Commissioner denied the

Plaintiff's application for disability benefits.  (Id. 79–80.)  On February 2, 2012, the Plaintiff

requested a hearing before an administrative law judge ("ALJ").  (Id. at 101–12.)

On August 20, 2012, the Plaintiff appeared with Sara Kafshi, Esq. ("Kafshi"), his

counsel, for a hearing before ALJ April M. Wexler.  At the hearing Kafshi stated:

> The Claimant is suffering from diverticulosis, diverticulitis, psoriasis, depression,
> and anxiety.  The diverticulitis, the Claimant had a colon resection in 1998.  He's
> continuing to have abdominal pain.  This limits him severely on the days that he
> has the pain which is . . . about four to five days per week.  Of those days, the

> Claimant would really be limited to less than a full range of work at any exertional level. Due to the pain that [the] condition causes and the limitations in sitting and standing . . . , it appears that [the Plaintiff] spends the majority of his day laying down when he has the pain. On the days when he is not having abdominal pain, he continues to have fatigue that's associated with his condition.

(Id. at 43.)

The Plaintiff described his stomach symptoms as follows: "I have a lot of problems with my stomach, since, I would say, about nine years/ten years ago"; "I get cramps and it's very uncomfortable"; "I'm fatigued a lot"; and "[i]t's hard to go to the bathroom." (R. 53–57.) He also stated that he saw Dr. Steven D. Rubin, a gastroenterologist, three times regarding his symptoms. (Id. at 57–58.) Dr. Rubin gave him some pills, which the Plaintiff testified initially made his symptoms better, but at some point, stopped helping his symptoms. (R. 57–58.) After informing Dr. Rubin that the medication was not helping him, Dr. Rubin allegedly told the Plaintiff to go to the hospital. (R. 58.) However, the Plaintiff stated that he ultimately did not go to the hospital because he could not afford it. (Id.) The Plaintiff also stated that at some unspecified point, he went to see Dr. Lester F. Goldblum, another gastroenterologist, who performed several colonoscopies on the Plaintiff. (Id. at 61–62.) According to the Plaintiff, Dr. Goldblum told him that he was "fine." (Id. at 61–62.) At the time of the hearing, the Plaintiff was not receiving any treatments for his stomach conditions.

The Plaintiff also testified that he saw Dr. Sukon Kim, a psychiatrist, from about 2003 to 2011 for "depression and anxiety" related to deaths in his family. (Id. at 58–60.) According to the Plaintiff, Dr. Kim prescribed Xanax for him, which the Plaintiff said helped. (Id. at 60.) However, he could not afford to keep seeing Dr. Kim or taking Xanax and after 2011, stopped treatment altogether. (Id.) As a result of his mental conditions, the Plaintiff testified that he had trouble with his memory and concentration, and sometimes "blank[ed] out."

The Plaintiff described a typical day as follows:

> I get up in the morning about 5:00 in the morning. I'm an early bird and I cook maybe eggs, eat eggs and I sit back down a little while. I occasionally go into the pool. I walk into the pool. I watch TV, go out maybe for a half-an-hour or so . . . . Occasionally I go to OTB [Off-Track-Betting], just to put a bet or two in and I come back home, basically.

(Id.) He also testified that if Alpha had not gone out of business, he likely would still be working, but it was a "possibility" that his health would have caused him to stop working at some point. (Id. at 64.)

He also stated that because of his symptoms, on a "bad day," which he said was five out of seven days, he could only sit or stand in place for a maximum of thirty minutes; the most he could walk was half a mile; and the most he could lift was fifteen pounds. (Id. at 63.)

Christina Boardman ("Boardman"), a vocational expert with the SSA also testified at the hearing. Relevant here, ALJ Wexler asked her:

> Let us assume a hypothetical individual of the Claimant's age and education and with the past jobs you just described. And let us assume the individual was limited to light work in that he can occasionally lift 20 pounds, frequently lift 10 pounds, sit for up to six hours; stand or walk for approximately six hours in an eight-hour day with normal breaks; occasionally climb ramps or stairs; never climb ladders; ropes or scaffolds; occasionally balance, stoop kneel, crouch and crawl; unlimited push and pull; limited to occasional reach[ing] in all directions, including overhead; must avoid concentrated exposure to fumes, odors, gases, poor ventilation, chemicals and other skin irritants. Can the hypothetical individual perform any of the Claimant's past work as described?

(R. 68–69.)

Boardman responded that such a hypothetical individual could not perform the Plaintiff's prior jobs as a truck driver and order clerk. (See id. at 68.) However, she stated that there were two occupations in the local or national economy as defined by the Dictionary of Occupational Titles ("DOT") that an individual with such limitations could perform. (See id. at 70.) By way of background, the DOT is a U.S. Department of Labor publication, which "gives a job type a

4

specific code — for example, '295.467–026 Automobile Rental Clerk' — and establishes, among other things, the minimum skill level and physical exertion capacity required to perform that job." Brault v. Soc. Sec. Admin., Com'r, 683 F.3d 443, 446 (2d Cir. 2012). Boardman testified that the hypothetical individual posited by ALJ Wexler could perform work as an "Usher," which the DOT defines as involving "light work" and "occupations concerned with taking tickets, distributing programs, and escorting patrons to seats in public places." See DOT § 344, *available at* http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT03A.HTM. According to Boardman, there are 8,470 "usher" jobs available in the New York/New Jersey/Long Island area, and 107,200 "usher" jobs available in the national economy. (SSA Rec. at 70.)

In addition, Boardman stated that the Plaintiff could perform "light work" as a "work ticket distributor," which the DOT defines as work that involves "[d]istribute[ing] workcards that contain instructions, such as type of yarn, type of stitch or stitches, and length and width of tubing, to workers engaged in knitting knit tubing." (See id. at 70); see also DOT § 221.667-010. According to Boardman, there are 16,020 such jobs in the New York region and 266,170 work ticket distributor jobs in the nation. (See SSA Rec. at 70.)

At the hearing ALJ Wexler also kept the record open for an additional two weeks so that the Plaintiff could provide updated medical records. (Id. at 42.)

## C. The Relevant Analytical Framework

On September 27, 2012, ALJ Wexler rendered a decision denying the Plaintiff's request for disability insurance benefits under Title II of the Act (the "September 27, 2012 Order").

Before addressing the September 27, 2012 Order, the Court finds it necessary to provide a brief overview of the framework for analyzing the entitlement to disability benefits.

To be entitled to disability insurance benefits, an individual must be (i) "insured for disability benefits;" (ii) not have attained retirement age; (iii) be a U.S. citizen or a foreign national under certain circumstances not relevant here; and (iv) and have a "disability." 42 U.S.C. § 423(1). ALJ Wexler found, and the parties do not dispute, that the Plaintiff is a citizen, not of retirement age, and was insured for disability benefits until December 13, 2013. (See SSA Rec. at 18.) However, ALJ Wexler found that the Plaintiff was not "disabled" within the meaning of Title II of the Act. That determination forms the central basis of the present appeal. (See id. at 24.)

As relevant here, the Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.A. § 423(g).

The SSA regulations set forth a five-step sequential evaluation process for determining whether a claimant meets the definition of "disability." 20 C.F.R. § 404.1520. The Second Circuit has implement that procedure as follows:

> (i) "[T]he [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity";
> (ii) "If he is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities";
> (iii) "If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations";
> (iv) "If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work"; and
> (v) "Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform."

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir.1982) (per curiam)).

"The claimant generally bears the burden of proving that she is disabled under the statute, but 'if the claimant shows that [her] impairment renders [her] unable to perform [her] past work, the burden then shifts to the [Commissioner] to show there is other gainful work in the national economy which the claimant could perform.'" Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) (alteration in original) (quoting Carroll v. Secretary of Health and Human Services, 705 F.2d 638, 642 (2d Cir. 1983)); see also Brault v. Soc. Sec. Admin., Com'r, 683 F.3d 443, 445 (2d Cir. 2012)).

## D. The September 27, 2012 Order

In the September 27, 2012 Order, at step 1 of the evaluation process, ALJ Wexler found that the Plaintiff had not engaged in substantial gainful activity since December 30, 2008, the alleged onset date of his claimed disability.  (SSA Rec. at 18.)

At step 2, she determined that the Plaintiff had the following "severe impairments": diverticulosis, diverticulitis, anxiety, depression, and psoriasis.  (Id.)

At step 3, she found that the Plaintiff's impairments did not "meet[]" or "medically equal" the listed impairments in Appendix 1, 20 C.F.R. § Pt. 404, Subpt. P, App. 1, which constitute *per se* disabling conditions.  (Id. at 3–5.)

At step 4, ALJ Wexler considered the medical records of the Plaintiff's treating physicians:  (i) Dr. Kim, his psychiatrist; (ii) Dr. David Kessler, his Dermatologist; and (iii) Dr. Rubin, his gastroenterologist.  (Id. at 20–21.)

She also gave "considerable weight" to consultative examinations performed on the

Plaintiff on behalf of the SSA by Paul Herman Ph.D., a psychologist, and Dr. Andrea Pollack, an

internist. (Id. at 21–22.)

Based on these records, ALJ Wexler found that the Plaintiff had the "residual functional

capacity" to perform "light work," which the SSA regulations describe as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting
> or carrying of objects weighing up to 10 pounds. Even though the weight lifted
> may be very little, a job is in this category when it requires a good deal of walking
> or standing, or when it involves sitting most of the time with some pushing and
> pulling of arm or leg controls. To be considered capable of performing a full or
> wide range of light work, you must have the ability to do substantially all of these
> activities. If someone can do light work, we determine that he or she can also do
> sedentary work, unless there are additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

However, ALJ Wexler added the following limitations to his residual functional capacity

to account for the Plaintiff's impairments:

> [The light work must consist of] occasionally lift[ing] twenty pounds, frequently
> lift[ing] ten pounds, sitt[ing] for up to six hours, stand[ing] or walk[ing] for
> approximately six hours in an eight hour workday with normal breaks;
> occasionally climb[ing] ramps or stairs; never climb[ing] ladders, ropes or
> scaffolds; occasionally balance[ing], stoop[ing], kneel[ing], crouch[ing] and
> crawl[ing], unlimited push/pull[ing], limited to occasional reaching in all
> directions, including overhead. Further, the claimant must avoid concentrated
> exposure to fumes, odors, dusts, gases, poor ventilation and chemicals and other
> skin irritants. Further, the claimant's mental impairments limit him to simple
> routine tasks involving no more than simple, one or two step instructions and
> simple work related decisions with few work place changes, low stress jobs,
> which means no work at a fixed production rate pace, meaning that work is
> checked at the end of the workday or workweek rather than hourly or throughout
> the day, and he needs the option to change positions from sitting to standing at
> will.

(SSA Rec. at 20.)

ALJ Wexler further found that although "the [Plaintiff's] medically determinable impairments could reasonably be expected to cause [his] alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity." (Id. at 22.)

Based on this residual functional capacity, ALJ Wexler found that the Plaintiff was unable to perform his past relevant work as a truck driver, warehouse worker, or stock selector. (Id. at 22.)

Proceeding to fifth step, ALJ Wexler considered the testimony of Boardman, a vocational expert, and the Plaintiff's age, education, work experience, and residual functional capacity. (Id. at 21–22.) She then found that the Plaintiff could perform work as an Usher or Work Ticket Distributor, which according to Boardman's testimony, are jobs that existed in significant numbers in the local and national economy. (Id. at 23–24.) Accordingly, she concluded that the Plaintiff was "not disabled" for the period December 30, 2008 to December 31, 2013 and was therefore not entitled to disability insurance benefits. (See id.)

On February 10, 2014, the SSA Appeal Council denied the Plaintiff's request for review of the September 27, 2012 Order. (See id. at 5–8.)

On August 11, 2014, the Plaintiff commenced the present action pursuant to 42 U.S.C. § 405(g), appealing the final decision of Commissioner based on his contention that ALJ Wexler's decision was "not supported by the substantial evidence."

Presently before the Court is a motion by the Plaintiff for summary judgment and a cross-motion by the Commissioner for a judgment on the pleadings. The Court will consider the parties' respective positions below.

## II. DISCUSSION

### A. The Legal Standard

'"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error."' Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (quoting Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)).

Thus, judicial review of the Commissioner's final decision requires "two levels of inquiry." Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987). The district court "first reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); see also Arzu v. Colvin, No. 14 CIV. 2260 (JCF), 2015 WL 1475136, at *8 (S.D.N.Y. Apr. 1, 2015) ("First, the court must decide whether the Commissioner applied the correct legal standard.") (citing Apfel, 167 F.3d at 773); see also Calvello v. Barnhart, No. 05 CIV. 4254 (MDF), 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008), report and recommendation adopted, No. 05 CIV 4254 SCR MDF, 2008 WL 4449357 (S.D.N.Y. Oct. 1, 2008) (same).

Next, the Court examines the administrative record to '"determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision[.]"' Burgess, 537 F.3d at 128 (quoting Shaw, 221 F.3d at 131). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004)). However, the Court may not properly "affirm an administrative action on grounds different from those considered by the agency." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999).

"[Substantial evidence] is still a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Com'r, 683 F.3d 443, 448 (2d Cir. 2012). For example. "[a]n ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits us to glean the rationale of an ALJ's decision.'" Cichocki v. Astrue, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983)). Moreover, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)).

In the present case, the Court finds — and Plaintiff does not dispute — that ALJ Wexler applied the correct five step framework in finding that the Plaintiff was not disabled within the meaning of Title II of the Act. Therefore, the Court finds that ALJ Wexler applied the correct legal standard to the Plaintiff's claim.

However, the Plaintiff asserts that ALJ Wexler's conclusion that the Plaintiff had the residual functional capacity to perform light work with some additional limitations was not supported by substantial evidence. (See The Pl.'s Mem. of Law at 3–10.) Specifically, the Plaintiff challenges (i) ALJ Wexler's determination that the Plaintiff's statements concerning the limiting effects of his symptoms were "not credible to the extent they are inconsistent with [his] . . . residual functional capacity"; and (ii) her failure to solicit additional medical opinions and call Dr. Pollack to testify at the August 20, 2012 hearing. (See id.). The Court will address each of these objections below.

**B. As to ALJ Wexler's RFC Determination**

As noted, at the fourth step of the evaluation process, the ALJ must determine the claimant's residual functional capacity ("RFC") to perform her relevant past work.

"[A]n individual's RFC 'is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.'" Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (Per Curiam) (alteration added) (quoting SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996)). Significantly, "[w]hen determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, . . . . but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Genier, 606 F.3d at 49 (citations omitted).

SSA regulations provide a two-step process for evaluating the credibility of a claimant's assertions of pain. "At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged.'" Id. (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." Id. (alteration in original) (quoting 20 C.F.R. § 404.1529(a)); see also SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996) ("[O]nce an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.").

"In evaluating the intensity and persistence of [the claimant's] symptoms, [the ALJ] consider[s] all of the available evidence, including [the claimant's] history, the signs and laboratory findings, and statements from [the claimant], [the claimant's] treating or nontreating source, or other persons about how your symptoms affect [the claimant]." 20 C.F.R. § 404.1529(c). Relevant factors, include:

> (i) the claimant's "daily activities"; (ii) "[t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms"; (iii) "[p]recipitating and aggravating factors"; (iv) "[t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms"; (v) "[t]reatment, other than medication, you receive or have received for relief of your pain or other symptoms"; (vi) "[a]ny measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.)"; and (vii) "[o]ther factors concerning your functional limitations and restrictions due to pain or other symptoms."

Id. at § 404.1529(c)(3).

Applying this framework here, ALJ Wexler determined that the Plaintiff's medically determinable impairments — namely, diverticulosis, diverticulitis, anxiety, depression, and psoriasis — "could reasonably be expected cause the alleged symptoms," but that his "statements concerning the intensity, persistence and limiting effects of these symptoms" were not credible to the extent they were inconsistent with her RFC assessment. (SSA Rec. at 22.) In making this determination, she noted that (i) "the record and [the Plaintiff's] testimony reveal that he is not now receiving treatment for diverticulosis/diverticulitis or anxiety/depression"; (ii) the Plaintiff testified that he "makes himself breakfast, may go to the pool for a swim, watches television, walks, cleans, and food shops"; and (iii) the Plaintiff "stopped working because his employer went out of business and testified that he would have continued working if the company had not shut down[.]" (Id.)

Based on this assessment, as well as a review of the Plaintiff's medical records, ALJ Wexler determined that the Plaintiff could perform "light work" with some additional limitations. (Id. at 20.) Specifically, to address his symptoms related to diverticulitis and diverticulosis, she limited the Plaintiff's RFC to jobs which required him to "stand or walk for approximately six hours in an eight hour workday with normal breaks"; "never climb ladders, ropes or scaffolds";"occasionally balance, stoop, kneel, crouch, . . . crawl, . . . [and] push/pull, limit[ed] to occasional reaching in all directions"; and gave him "the option to change positions from sitting to standing at will." (Id. at 20, 22.) To address his psoriasis, ALJ Wexler limited the Plaintiff's RFC to jobs that avoid "concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and chemicals and other skin irritants." (Id. at 20, 22.) Finally, to address his anxiety and depression, she limited his RFC to unskilled work involving "simple routine tasks with few work place changes, low stress jobs." (Id. at 20, 22.)

Upon an independent review of the record, the Court finds that ALJ Wexler's RFC determination is supported by substantial evidence.

With regard to the Plaintiff's mental conditions, Dr. Kim, a psychiatrist who treated the Plaintiff from 2005 to 2011, stated in his notes that the Plaintiff occasionally had issues with sleeping and on two occasions in February 2009 and June 28, 2010, indicated that the Plaintiff was a "wreck." (See id. at 311–317.) However, his notes state that he prescribed the Plaintiff Cymbalta, Xanax, and Lexapro, and that the Plaintiff responded well to the medication. (See id.) On several occasions, Dr. Kim noted that the Plaintiff was "sleeping well" and on June 23, 2011, in one of his last sessions, noted that the Plaintiff was doing "much better." (See id. at 311, 313, 315, 317.) Similarly, Dr. Herman, who performed a mental status examination of the Plaintiff on December 23, 2011, noted that the Plaintiff had never been hospitalized for psychiatric reasons;

was "cooperative with adequate social skills"; "casually dressed and adequately groomed"; and "coherent . . . with no evidence of hallucinations, delusions, or paranoia in the setting." (Id. at 197–98.) Dr. Herman described the Plaintiff's attention as "somewhat below average" and his "recent memory skills" as mixed but concluded that these deficits were not significant enough to "interfere with the claimant's ability to function on a daily basis[.]" (Id. at 198.) In his testimony at the August 20, 2012 hearing, the only limitation that the Plaintiff pointed to as a result of his mental conditions was having some trouble with his memory and occasionally "blank[ing] out" during conversations. (Id. at 65.)

Based on this evidence, it is clear that the Plaintiff's symptoms from depression and anxiety were at most, slight limitations on his ability to function in a work setting on a regular and continuing basis. Therefore, the Court finds that ALJ Wexler's conclusion that the Plaintiff had the RFC to perform unskilled work involving low stress and "simple routine tasks" to be amply supported by the record.

With regard to the Plaintiff's physical conditions — namely, psoriasis, diverticulosis, and diverticulitis —, the medical records from the Plaintiff's treating physicians do not show any substantial impairments to the Plaintiff's ability to function.

Dr. Kessler, a dermatologist who treated the Plaintiff from September 2005 to May 2012, indicated in his notes that he prescribed the Plaintiff with Clobex spray and T-Gel shampoo to treat his psoriasis and that the Plaintiff responded well to the treatment. (Id. at 351–355.) On January 23, 2012, Dr. Kessler filled out a questionnaire regarding the Plaintiff's treatment, in which he stated that the Plaintiff's current symptoms were "red scaly indurated plaques on elbows, legs" but indicated that the Plaintiff had "no limitation" on his ability to do work-related physical activities because of those symptoms. (Id. at 236.)

With regard to the Plaintiff's diverticulitis and diverticulosis, Dr. Goldblum, who performed colonoscopies on the Plaintiff on January 29, 2005 and May 21, 2009, respectively, found that the Plaintiff had "internal hemorrhoids" and "<u>mild</u> diverticulosis." (<u>Id.</u> at 345–347) (emphasis added). Similarly, on January 11, 2011, Dr. Rubin examined the Plaintiff and noted he had a clinical history of "constipation and lower abdominal pain." (<u>Id.</u> at 320.) However, Dr. Rubin described a CT scan of the Plaintiff's abdomen as "unremarkable" and stated that "[t]here is no gastrointestinal obstruction." (<u>Id.</u> at 320.) Indeed, the fact that prior to December 30, 2008, the alleged onset of his disabilities, the Plaintiff suffered from the same stomach conditions that he complains of here and was able to work without a problem for three years gives further credence to ALJ Wexler's conclusion that the Plaintiff was not disabled.

In addition, on December 23, 2011, Dr. Pollack, an internist, performed a physical exam on the Plaintiff on behalf of the SSA. In his report of the exam, Dr. Pollack noted that the Plaintiff appeared to be in "no acute distress"; "[c]an walk on heels and toes without difficulty"; and was able to "squat 3/4 of the way down" but that it "hurt[] his abdomen to do it." (<u>Id.</u> at 192–194.) He further found no limitations in the Plaintiff's "flexion, rotary movement"; "sensory deficit"; "upper and lower extremities"; and "fine motor activity." (<u>Id.</u> at 193.) Based on this examination, Dr. Pollack concluded that the Plaintiff had a "moderate restriction in bending, lifting, and carrying" and a "mild restriction in squatting." (R. 194.)

The Plaintiff testified that his stomach conditions made him unable to sit or stand for more than half an hour or walk more than half a mile for five out of seven days. (<u>Id.</u> at 63.) However, he also testified that he got up every morning; was able to cook himself breakfast; walk in his pool; walk around the block; and go food shopping with his fiancée. (<u>Id.</u> at 61–63.)

Therefore, his own testimony and the medical records described above indicate that the Plaintiff had, at most, moderate limitations on his ability to work. Accordingly, the Court finds that there was substantial evidence supporting ALJ Wexler's determination that (i) the Plaintiff could perform "light work" with some limitation on his sitting and standing; and (ii) the Plaintiff's subjective complaints about his symptoms were not entirely credible. See Wavercak v. Astrue, 420 F. App'x 91, 94 (2d Cir. 2011) (Summary Order) ("In rejecting Wavercak's testimony as to the severity of his impairment, the ALJ reasonably relied on contrary evidence in the record, including extensive testimony and treatment notes from numerous physicians."); Donnelly v. Colvin, No. 13-CV-7244 (AJN) (RLE), 2015 WL 1499227, at *15 (S.D.N.Y. Mar. 31, 2015) ("The ALJ properly evaluated Donnelly's credibility. She relied on objective, medical records and found that some of Donnelly's statements were contradicted by the medical records. (Tr. at 17.) She then inferred those comments were not credible . . . . It is within the discretion of the ALJ to evaluate the credibility of claimant's testimony and render an independent judgment in light of the medical findings and other evidence regarding the true extent of the symptoms alleged.").

The Plaintiff argues that ALJ Wexler omitted from her analysis the Plaintiff's testimony indicating that he had "difficulty lifting, sleeping, or concentrating, and merely states that he watches television and food shops, without stating the length of time he is able to engage in each activity." (The Pl.'s Mem. of Law at 7–8.) According to the Plaintiff, had ALJ Wexler considered the balance of the Plaintiff's complaints, she would have found the Plaintiff to be totally disabled. (Id. 9.) In support of his argument, the Plaintiff relies on Genier v. Astrue, 606 F.3d 46 (2d Cir. 2010).

In Genier v. Astrue, an ALJ discredited a morbidly obese claimant's testimony regarding the limitations to his daily functions because the claimant "indicated in a questionnaire dated May 11, 2006 that he was able to care for his dogs, vacuum, do dishes, cook, and do laundry" and testified at the hearing that he "performs these household chores." 606 F.3d at 48. The Second Circuit found that the ALJ's credibility determination was not supported by the substantial evidence because the ALJ's decision "was based on [a] serious misunderstanding of [the claimant's] statements." Id. at 50. Specifically, the ALJ omitted the part of the claimant's questionnaire in which he stated that "he required the assistance of a parent for each of these tasks because of his severe fatigue." Id. In addition, the ALJ failed to specify that the claimant's statement regarding household chores related to a different time period and therefore, did not contradict the Plaintiff's assertions of pain. Id. Accordingly, the Court found that "[b]ecause the ALJ's adverse credibility finding, which was crucial to his rejection of [the claimant's] claim, was based on a misreading of the evidence, it did not comply with the ALJ's obligation to consider 'all of the relevant medical and other evidence,' 20 C.F.R. § 404.1545(a)(3), and cannot stand."

By contrast, in this case, ALJ Wexler *did* consider the Plaintiff's statements concerning the "intensity, persistence and limiting effect of [his] symptoms," and to the extent they were corroborated by the medical evidence, incorporated those limitations into the RFC. To the extent the Plaintiff's statements were not corroborated by the medical evidence, ALJ Wexler disregarded them. (See R. 22.) The fact that ALJ Wexler did not specifically refer to every statement made by the Plaintiff was not error, as the Plaintiff appears to contend. See Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every

item of testimony presented to him or have explained why he considered particular evidence underlined unpersuasive or insufficient to lead him to a conclusion of disability.") (emphasis added); Zokaitis v. Astrue, No. 1:10-CV-30, 2010 WL 5140576, at *20 (D. Vt. Oct. 28, 2010) report and recommendation adopted, No. 1:10-CV-00030-JGM, 2010 WL 5140063 (D. Vt. Dec. 13, 2010) ("While Zokaitis points to other evidence in the record tending to support her assertions, the ALJ need not give identical weight to all the evidence regarding a claimant's subjective complaints of pain.").

Rather, ALJ Wexler found that some of the Plaintiff's statements regarding his pain were not corroborated by the objective medical evidence and chose not to credit them in her RFC. This determination was well within ALJ Wexler's discretion and as noted above, clearly supported by the substantial weight of the evidence. See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979) ("The ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant."); Sickles v. Colvin, No. 12-CV-774 MAD/CFH, 2014 WL 795978, at *13-14 (N.D.N.Y. Feb. 27, 2014) ("The ALJ has taken statements made by the Plaintiff about what she asserted she can do, together with the credible medical evidence, and accurately described Plaintiff's capabilities and limitations. Based on the foregoing, the Court finds the ALJ's credibility determination is amply supported by substantial evidence, and was made in accordance with the applicable law.").

Accordingly, the Court finds that the determination in Genier v. Astrue is not applicable to this case and affirms the RFC determination by ALJ Wexler because it is supported by substantial evidence.

**C. As to ALJ Wexler's Duty To Develop the Record**

The Plaintiff also asserts that a remand is warranted because ALJ Wexler failed to adequately develop the administrative record. (The Pl.'s Reply Mem. of Law at 2.) According to the Plaintiff, there was a gap in the administrative record because (i) although Dr. Pollack addressed the Plaintiff's ability to perform some aspects of light work, she did not address the Plaintiff's limitations with respect to all aspects of light work, including sitting, standing, and walking; and (ii) many of the medical records were dated because the Plaintiff chose to stop some treatment in 2011 due to financial constraints. (See the Pl.'s Mem. of Law at 10; the Pl.'s Reply Mem. of Law at 2–6.) The Court finds both arguments to be without merit.

The SSA regulations provide that "[i]f the evidence in your case record is insufficient or inconsistent, we may need to take additional actions." 20 C.F.R. § 404.1520b (emphasis added). Among the options, the SSA regulations provide that the ALJ "may recontact your treating physician, psychologist, or other medical source. We may choose not to seek additional evidence or clarification from a medical source if we know from experience that the source either cannot or will not provide the necessary evidence." Id. at § 404.1520b(c) (emphasis added).

Clearly, the use of the word "may" suggests that the SSA intended to leave ALJs with discretion to re-contact a medical source to resolve an inconsistency or insufficiency. See Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 34 (2d Cir. 2013) (Summary Order) ("Taken more broadly, they suggest remand is not always required when an ALJ fails in his duty to request opinions, particularly where, as here, the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity."); Gabrielsen v. Colvin, No. 12-CV-5694 KMK PED, 2015 WL 4597548, at *6 (S.D.N.Y. July 30, 2015) ("The regulations that

now control, 20 C.F.R. §§ 404.1520b(c)(1) and 416.920b(c), provide that re-contacting the treating physician is an option for correcting inconsistencies in the record.").

Nevertheless, in certain limited circumstances, the Second Circuit has found that an ALJ erred by not re-calling a medical source. For example, in <u>Selian v. Astrue</u>, 708 F.3d 409 (2d Cir. 2013), cited by the Plaintiff, in making the determination that the Plaintiff could perform "light work," the ALJ primarily relied on a doctor's opinion that the plaintiff "should be able to lift . . . objects of a mild degree of weight on an intermittent basis." <u>Id.</u> at 421. The Second Circuit described the doctor's opinion as "remarkably vague" because, according to the Circuit Court, it was impossible to discern what the doctor meant by "mild degree" and "intermittent." Thus, the Court found that the ALJ's RFC determination was based on "sheer speculation" and remanded the case for further administrative proceedings. <u>Id.</u>

Similarly, in <u>Genier v. Astrue</u>, 606 F.3d 46 (2d Cir. 2010), also relied on by the Plaintiff, the Second Circuit suggested in *dicta* that the ALJ erred in failing to solicit a medical opinion from the plaintiff's surgeon given that the surgeon had written a letter which "tend[ed] to support [the claimant's] assertion of disability." <u>Id.</u> at 50.

Also, in <u>Rosa v. Callahan</u>, *supra*, another example relied on by the Plaintiff, the Second Circuit found remand appropriate because the "ALJ failed to obtain adequate information from [the claimant's] treating physician, . . . ; she failed to seek potentially relevant information from a number of other doctors and treatment facilities; and she jumped to conclusions that were not adequately supported by the consultant reports before her." 168 F.3d at 83.

By contrast, here, there is nothing ambiguous or vague about Dr. Pollack's report, as was the case in <u>Selian.</u> Dr. Pollack stated clearly that the Plaintiff has a "moderate restriction in bending, lifting, and carrying" and a "mild restriction in squatting." (SSA Rec. at 194.) Further,

unlike the ALJ in the cases discussed above, there is a wealth of medical records from the Plaintiff's treating physicians which report very mild symptoms resulting from the Plaintiff's skin, stomach, and mental conditions. ALJ Wexler was entitled to and did rely on these records, as well as the Plaintiff's own testimony, in making her RFC. See Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."); Flagg v. Astrue, No. 5:11-CV-00458 (LEK), 2012 WL 3886202, at *5 (N.D.N.Y. Sept. 6, 2012) ("The Court finds Plaintiff's argument unavailing because the record contains substantial evidence from both treating and consultative sources indicating that her cognitive and mental abilities were not significantly impaired. This is not a case in which a crucial issue of mental capacity is unexplored or left undeveloped.").

The Plaintiff points to no authority to support his position that Dr. Pollack's opinion was fatally deficient because it did not discuss whether the Plaintiff had "any sitting, standing or walking limitations." (The Pl.'s Reply Mem. of Law at 2.)

To the contrary, where the medical records provide ample information to support an RFC finding, courts have repeatedly refused to remand cases even where an ALJ fails to solicit *any* opinion from a doctor regarding the Plaintiff's RFC. See Tankisi, 521 F. App'x at 34 ("The medical record in this case is quite extensive. Indeed, although it does not contain formal opinions on Tankisi's RFC from her treating physicians, it does include an assessment of Tankisi's limitations from a treating physician, Dr. Gerwig. Given the specific facts of this case, including a voluminous medical record assembled by the claimant's counsel that was adequate to permit an informed finding by the ALJ, we hold that it would be inappropriate to remand solely

on the ground that the ALJ failed to request medical opinions in assessing residual functional capacity."); Gentile v. Colvin, No. 1:13-CV-01009 (MAT), 2016 WL 336024, at *4 (W.D.N.Y. Jan. 28, 2016) ("Here, . . . the record was complete despite the ALJ's apparent failure to request a functional assessment from a treating physician."); Arboleda ex rel. L.M.R. v. Colvin, No. 12 CIV. 03987 (LGS) (HB), 2014 WL 5786948, at *3 (S.D.N.Y. Nov. 6, 2014) ("Remand here would be similarly inappropriate if based solely on the ground that the ALJ did not request a formal report from Dr. Rastogi, in light of the extensive record. Accordingly, Plaintiff's motion for remand pursuant to Sentence Four of the Act is denied.").

In this case, Dr. Pollack *did* render an opinion on the Plaintiff's RFC. Thus, the case for remand is even weaker than in the cases cited above. Further, the fact that Dr. Pollack did not specify any limitations with respect to the Plaintiff's standing, sitting, or walking does not create a gap in the record or in her report, particularly given the fact that that the medical records do not support the Plaintiff's subjective belief that he had any such limitations. Accordingly, the Court finds no error in ALJ Wexler's failure to re-call Dr. Pollack at the August 20, 2012 hearing.

The Plaintiff's contention that there was a gap in the medical records because the Plaintiff stopped getting treatment for his conditions fares no better. At the time ALJ Wexler rendered the September 27, 2012 decision, she had the following medical records before her: (i) a report from Dr. Rubin, the Plaintiff's treating gastroenterologist, dated, January 11, 2011; (ii) notes from Dr. Kim, the Plaintiff's treating psychiatrist, up to August 11, 2011; (iii) a report from Dr. Pollack, a consultative physician, dated, December 23, 2011; (iv) an evaluation from Dr. Herman, a consultative psychologist, dated, December 23, 2011; and (v) notes and a questionnaire from Dr. Kessler, his treating dermatologist, dated, January 23, 2012. (See SSA Rec. at 191, 195, 233, 272, 319.)

Thus, at most, there was a year between the Plaintiff's medical examinations and the August 20, 2012 hearing and the September 27, 2012 Order. The Plaintiff did not testify that he was hospitalized or experienced any dramatic worsening of his symptoms during the period between his last medical evaluations and the hearing. Rather, his symptoms were consistent from December 30, 2008, the onset date of his alleged disabilities, and August 20, 2012, the date of the administrative hearing. Thus, there was no need to request updated medical records to evaluate the severity of the Plaintiff's symptoms.

Under these circumstances, the Court does not find any gap in the administrative record and therefore, is not persuaded by the Plaintiff's contention that ALJ Wexler erred by not soliciting additional medical opinions. See Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996) ("The ALJ already had obtained and considered reports from Dr. El–Dakkak, Dr. Sanchez, and Dr. Celestin. The ALJ had before him a complete medical history, and the evidence received from the treating physicians was adequate for him to make a determination as to disability.").

In sum, the Court finds that ALJ Wexler's determination that the Plaintiff was not disabled within the meaning of Title II of the Act **is** supported by substantial evidence.

### III. CONCLUSION

For the foregoing reasons, the Court denies the Plaintiff's motion for summary judgment, grants the Commissioner's cross-motion for a judgment on the pleadings, and affirms the Commissioner's decision denying the Plaintiff disability benefits. The Clerk of the Court is directed to close this case.

**SO ORDERED.**
Dated: Central Islip, New York
March 30, 2016


                                        ___*Arthur D. Spatt*_____
                                          ARTHUR D. SPATT
                                        United States District Judge